**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**Interlogix, Inc., f/k/a/**
**ITI Technologies, Inc.,**

**Plaintiff,**

**v.**

**Honeywell, Inc., Honeywell International, Inc., Pittway Corporation, System Sensor, Ademco Group, and ADI**

**Defendants.**

**Civil No. 01-115 (DSD/SRN)**

**ORDER**

---

Brooks F. Poley, Esq. and Philip R. Mahowald, Esq., on behalf of Plaintiff.

Jonathan W. Dettmann, Esq. and Elizabeth H. Schmiesing, Esq., on behalf of Defendant.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on November 13, 2002, on Defendant's Motion to Strike the Expert Report of Dr. Alvin Star (Doc. No. 21).

This Order addresses that motion.

## I. BACKGROUND.

### A. Procedural History.

Plaintiff is a designer, manufacturer, and distributor of electronic security systems for residential and commercial customers. Plaintiff filed the Complaint in state court which included claims resulting from an agreement under which Plaintiff purchased wireless smoke detectors from Defendant. On January 19, 2001, Defendants removed the case to Federal District Court,

FILED JAN 0 9 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD ______
DEPUTY CLERK ______

alleging diversity jurisdiction pursuant to 28 U.S.C. § 1332. On February 26, 2001, Defendants filed their Answer, denying liability on all claims. Defendants also brought counterclaims for correction of inventorship of U.S. Patent Nos. 5,686,885 and 5,686,896, and infringement of U.S. Patent No. 5,686,896 (the '896 Patent). On April 2, 2001, Plaintiff filed an Answer to the counterclaims, and included its own claim for infringement of the '896 Patent.

**B. Dr. Alvin Star's Report.**

On June 17, 2002, Plaintiff submitted the report of its expert Dr. Alvin Star. Star is currently Professor of Marketing, Emeritus, at the University of Illinois at Chicago. His report included the following analysis:

> A. Direct Actual Damages: Lost Profits for Plaintiff
>
> A study of the facts of the case, including the alleged misappropriation of Plaintiff's patent and the deposition transcript of Thomas N. Precht, leads to the conclusion that Defendants' sales of approximately 600,000 allegedly infringing wireless smoke detector units have come at the expense of Plaintiff. In his depositions Mr. Precht states that in the period October, 1997 through April, 2002 System Sensor sold approximately 720,000 allegedly infringing wireless smoke detector units to Plaintiff, Ademco, ADT, and perhaps others (the deposition is not entirely clear on this). Of this total Mr. Precht states that 120,000 units were sold to Plaintiff and 600,000 to Ademco, ADT, and others, if any. Since according to Plaintiff's counsel these products employed technology covered by United States Patent No. 5,686,896, it follows that if Defendants had not infringed the patent as alleged, then Plaintiff by virtue of its legal patent monopoly would have sold an additional 600,000 units in that time period instead and made a profit on those sales. Plaintiff's profits, what it calls contribution margin, on wireless smoke detectors in the period January, 1998 through May, 2002 after deducting all costs of goods sold, marketing, and customer service expenses average $18.66 per unit. (Detail of Plaintiff's pertinent financial data is shown in Table C. It should be noted that Plaintiff's data do not cover precisely the same time period as Defendants' and that Plaintiff shows sales of only 99,430 units for the roughly same

> time period as opposed to the 120,000 units estimated by Mr. Precht. To be conservative I use Mr. Precht's estimate in my calculations.) Accordingly, in Table A, I have calculated from these data Plaintiff's direct actual lost profits of $11,196,000. This is the amount of additional profit Plaintiff would have earned in the given time period if Defendants had not misappropriated Plaintiff's patent.
>
> B. Indirect Actual Damages: Lost Profits of Plaintiff
>
> Because, according to Plaintiff's counsel, Plaintiff's wireless smoke alarm units are not compatible with those made by Defendants for Ademco, ADT, and perhaps others, the purchasers of the 600,000 smoke alarm units referred to in section IVB above would be required to purchase the rest of the security system, including specifically the control panel, from Plaintiff. If we assume, conservatively, that an average of three wireless smoke alarm units are included in each system sold, then Plaintiff would have sold an additional 200,00 security systems in the same time period of section IVB wireless unit sales. Table D shows Plaintiff's financial data for security systems including control panel units. These data show that Plaintiff's profits after cost of goods sold and sales and marketing expenses (contribution margin) to average $121.54 per system sold. However, this figure includes the profit of $18.66 [on] each of the assumed three wireless smoke alarms in each system. When this amount is deducted a net contribution of $65.56 would be made by Plaintiff on each system sale convoyed to it in the relevant time period by virtue of its patent on the wireless unit. Therefore, on the 200,000 additional security systems, which would have been sold by Plaintiff but for the alleged infringement of its patent, Plaintiff would have made $13,112,000. The detailed calculation is shown in Table B. This is the amount of indirect actual damages, lost profits of Plaintiff, in this category.

(Affidavit of Jonathan W. Dettman, Ex. A, Expert Report of Dr. Alvin D. Star.)

Star concludes that "[t]he appropriate damages caused by Defendants to Plaintiff through misappropriation and unauthorized use of Plaintiff's United States Patent No. 5,686,896 include actual direct lost profits of $11,196,000 and indirect actual lost profits of $13,112,000 for a total of $24,308,000." Id.

## II. DISCUSSION.

### A. Measuring Patent Infringement Damages.

In Riles v. Shell Exploration & Production Co., 298 F.3d 1302, 1311 (Fed. Cir. 2002), the Federal Circuit described the method for proving damages in patent infringement cases. It explained,

> Upon a finding of infringement, Title 35 permits an award of "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284 (1994). In *Aro Manufacturing*, the Supreme Court stated that the statutory measure of "damages" is "the difference between [the patent owner's] pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507, 84 S.Ct. 1526, 12 L.Ed.2d 457, 141 USPQ 681, 694 (1964). This formulation requires the patentee to reconstruct the market, by definition a hypothetical enterprise, to project economic results that did not occur. "To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1350, 51 USPQ2d 1556, 1562 (Fed.Cir.1999). The statute guarantees patentees a reasonable royalty even when they are unable to prove entitlement to lost profits or an established royalty rate. A "reasonable royalty" contemplates a hypothetical negotiation between the patentee and the infringer at a time before the infringement began. *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078, 219 USPQ 679, 682 (Fed.Cir.1983). Again, this analysis necessarily involves some approximation of the market as it would have hypothetically developed absent infringement. This analysis, in turn, requires sound economic and factual predicates. *See, e.g., Crystal Semiconductor*, 246 F.3d 1336; *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 58 USPQ2d 1692 (Fed.Cir.2001).

Within the lost profits category of damages, the Federal Circuit has explained the most common approach to proving entitlement as follows:

> *Panduit Corp. v. Stahlin Bros. Fibre Works*, Inc., 575 F.2d 1152, 197 USPQ 726 (6th Cir.1978), articulated a four-factor test that has since been accepted as a useful, but non-exclusive, way for a patentee to prove entitlement to lost profits damages. *State Indus.*, 883 F.2d at 1577, 12 USPQ2d at 1028. The *Panduit* test requires that a patentee establish: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of the profit it would have made. *Panduit*, 575 F.2d at 1156, 197 USPQ at 730. A showing under *Panduit* permits a court to reasonably infer that the lost profits claimed were in fact caused by the infringing sales, thus establishing a patentee's prima facie case with respect to "but for" causation. *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1141, 17 USPQ2d 1828, 1831 (Fed.Cir.1991). A patentee need not negate every possibility that the purchaser might not have purchased a product other than its own, absent the infringement. *Id.* The patentee need only show that there was a reasonable probability that the sales would have been made "but for" the infringement. *Id.* When the patentee establishes the reasonableness of this inference, e.g., by satisfying the Panduit test, it has sustained the burden of proving entitlement to lost profits due to the infringing sales. *Id.* at 1141, 17 USPQ2d at 1832. The burden then shifts to the infringer to show that the inference is unreasonable for some or all of the lost sales. *Id.*

Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1545 (Fed.Cir.1995).

Despite the frequent use of Panduit, the Federal Circuit has repeatedly noted that is not the only acceptable measure of lost profits.

> Generally, the *Panduit* test has been applied when a patentee is seeking lost profits for a device covered by the patent in suit. However, *Panduit* is not the *sine qua non* for proving "but for" causation. If there are other ways to show that the infringement in fact caused the patentee's lost profits, there is no reason why another test should not be acceptable. Moreover, other fact situations may require different means of evaluation, and failure to meet the *Panduit* test does not *ipso facto* disqualify a loss from being compensable.

Id. at 1548.

**B. Requirements for Expert Testimony.**

Federal Rule of Evidence 702 governs the admissibility of expert testimony. The Rule provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the from of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods of reliability to the facts of the case.

"Rule 702 reflects an attempt to liberalize the rule governing the admission of testimony." Lauzon v. Senco Products, Inc., 270 F.3d 681, 686 (8th Cir. 2001) quoting Weisgram v. Marley Co., 169 F.3d 514, 523 (8th Cir. 1999). "Rule 702 is one of admissibility rather than exclusion." Arcoren v. U.S., 929 F.2d 1235, 1239 (8th Cir. 1991).

Federal Rule of Civil Procedure 26(a)(2)(B) states that an expert report "shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions."

**C. Admissibility of Expert Testimony under Daubert.**

> The Supreme Court in *Daubert* makes it plain that the trial court is to act as a gatekeeper in screening such testimony for relevance and reliability, that is, make an assessment whether the reasoning and methodology underlying the testimony is scientifically valid. In doing so, the court should consider, among other factors (1) whether the theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) whether the theory has been generally accepted.

Peitzmeier v. Hennessy Indus., Inc., 97 F.3d 293, 296-97 (8th Cir. 1996) (internal citations

omitted) quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94 (1993). "It is clear the Court did not intend for a trial judge to automatically exclude relevant evidence if one of these conditions was not fully satisfied." Jenson v. Eveleth Taconite Co., 130 F.3d 1287, 1298 (8th Cir. 1997).

Although Daubert specifically concerned scientific evidence,

> several courts have applied the *Daubert* requirements not only to proffered expert "scientific" evidence, but also to the expert "mathematical" lost profits evidence at issue in this case. *See Target Mkt. Publ'g, Inc. v. Advo, Inc.*, 136 F.3d 1139, 1142-44 (7th Cir.1998) (applying Daubert test to lost profits calculation in breach of contract case); *Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, No. 94 C 50392, 1998 WL 299300, at *1 (N.D.Ill. June 3, 1998) (same); *Terrell v. Childers*, No. 93 C 2460, 1996 WL 385310, at *8-11 (N.D.Ill. July 3, 1998) (applying *Daubert* analysis to lost profits calculation based on benefit-of-the-bargain theory in common law fraud case).

Otis v. Doctor's Associates, Inc., No. 94 C 4227, 1998 WL 673595, *4 (N.D. Ill. Sept. 14, 1998).

While not all of the Daubert factors need to be satisfied, the Eighth Circuit has repeatedly emphasized that courts must diligently exercise their gatekeeping function. In Concord Boat Co. v. Brunswick Corp., the court explained that "[e]xpert testimony that is speculative is not competent proof and contributes 'nothing to legally sufficient evidentiary basis.'" 207 F.3d 1039, 1057 (8th Cir. 2000) (quoting Weisgram v. Marley Co., 528 U.S. 440, 442 (2000)). In addition, one court has explained that "[e]xperts are now held to a level of accountability, that requires factual predicates, in historical fact, or in competent evidence, which allows a factfinder to independently verify the accuracy of the expert's results. Absent such reliable verification, the expert's opinion is not admissible." Kemp v. Tyson Seafood Group, Inc., 2000 WL 1062105, *7 (D. Minn. 2000).

**D. The Parties' Positions.**

**DEFENDANTS**

Defendants argue that Star's lost profits analysis does not meet the Daubert standard and should be stricken. They emphasize that their motion is not based on a disagreement over Star's conclusions. Instead, it is the "gaping holes in the analysis and methodology" that render the report inadmissible. Defendants concede that they are not aware of any infringement cases in which Daubert was used to exclude expert testimony at this stage of the proceeding for failing to satisfy Panduit. They argue, however, that striking Star's report because it lacks any methodology or analysis is completely consistent with the Court's gatekeeping function under Daubert.

**1. First Panduit Factor: Demand.**

Defendants state that Star fails to present any evidence showing that demand existed for the patented pre-low battery warning feature. Defendants observe that Star does not even use the word "demand" in his report, "let alone demonstrate that the patented, pre-low feature drove the sales of smoke detectors in which it was included as one of many features." Further, according to Defendants, Star failed to consider whether the pre-low feature is one of the key features that drives sales of smoke detectors. Defendants suggest, instead, that sales revolve around ease of installation, appearance, and a long-life battery lasting up to nine or ten years. As a final flaw, Defendants explain,

> Dr. Star failed to consider the unique corporate relationship present in this case. The potential buyer of a substitute product from plaintiff in Dr. Star's analysis is one of the defendants, namely Ademco. But Ademco is a sister company of defendant System Sensor, the manufacturer of the accused detectors. Ademco would not have stopped buying detectors from System Sensor - its own

sister company - even if System Sensor could not offer the pre-low feature.

**2. Second Panduit Factor: Availability of Non-infringing Substitute Products.**

Defendants state that Star fails ever to discuss or refer to any evidence concerning whether non-infringing substitute smoke detectors were being sold or could be made. They explain that System Sensor could have disabled the pre-low battery feature, "and most important, Defendants themselves sold smoke detectors that lacked the pre-low feature, and thus were non-infringing substitutes. Ademco in particular would have bought smoke detectors without the pre-low battery feature from System Sensor if those with the feature were not available from System Sensor."

**3. Third Panduit Factor: Ability to Meet Demand.**

Defendants explain that while Star states Plaintiff sold only 99,430 smoke detectors, he concludes that Plaintiff is entitled to lost profits on 600,000 units. They argue that because Star provides no facts to support the proposition that Plaintiff would have been capable of producing and selling six times as many units as it actually did, the opinion should be stricken.

**4. Fourth Panduit Factor: Amount of Profit but for Infringement.**

Defendants state that this is the only Panduit factor Star actually addresses. Nevertheless, according to Defendants, "[t]his is like a personal injury plaintiff offering no evidence of the defendant's responsibility, but skipping right to damages and resting." Citing Riles, Defendants argue that the first three factors are not a purely factual predicate from which the fourth factor may be separated. Instead, the test is a theoretical exercise in which an expert must reconstruct a hypothetical market. Hence, any means of calculating damages is necessarily intertwined with

the bases for the damages. As a result, the report can not avoid the gatekeeping function of Daubert by providing no information on the first three factors and simply focusing on the amount of lost profits.

Defendants assert that analysis of economic factors including the relationship Ademco might have carried on with System Sensor is beyond the purview of basic fact witnesses and must be part of the lost profits analysis, and, therefore, must be in Star's report. Both the 600,000 and the $18.66 figures that are part of Star's lost profits conclusion are based on economic calculations which include considerations of demand, capability of production, and the number or existing non-infringing products. And although Star uses those figures, he supplies no basis for their calculation. Defendants further explain that this would be true not only under Panduit, but under any valid "but for" analysis. Thus, Star's report can not satisfy any acceptable test for measuring lost profits.

Defendants also emphasize that it is irrelevant for purposes of the present motion whether there are additional facts that could support Star's conclusion, or that there may be a reasonable fact dispute with respect to damages. They state that "[r]egardless of whether facts exists that might support a claim for lost profits, Dr. Star cannot testify about his conclusion that is based on those facts if they are not discussed in his report." Defendants then quote Fed. R. Civ. P. 26(a)(2)(B) which requires the statement to include "the basis and reasons therefore; [and] the data or other information considered by the witness in forming the opinions." They conclude that because Star's report lacks its own required factual support it should be stricken.

As further shortcomings, Defendants note the following:

- The contribution margin on Plaintiff's parts as analyzed fluctuates from $26.27 to $16.86 (56%) in two years without explanation.

- There is no analysis or detail of Interlogix's financial records which Star states he relied upon to determine the hypothetical profit margin.
- There is no analysis of what Interlogix parts would have been sold in place of Defendants' smoke detectors and why Star used certain parts but not others in estimating lost profits.
- There is no justification for using a weighted measure average of all parts cited by Star (ranging from $45 to $61 per unit) for price. Two of the three parts were. apparently discontinued in 2000 and the third dropped greatly in sales in 2002.
- There is no documentation provided relating to the three categories of costs taken into account.
- There is no analysis or evidence of the probable impact on costs if Interlogix sold 600,000 smoke detectors over and above the 99,340 actually sold.

Defendants then cite Eighth Circuit and other federal precedent to argue that even if an economic expert's method is uncontroversial, conclusions should still be found unreliable when the expert fails to consider all the variables which could affect that conclusion.

**5. Convoyed Sales Damages.**

Defendants explain initially that Star's "failure to show Interlogix' entitlement to lost profits due to lost sales of wireless smoke detectors dooms his conclusions regarding convoyed sales." They also argue that Star assumes without any support that the pre-low battery feature drives the sale of entire security systems. They emphasize that at most, the smoke detectors sell for $61, while the entire security system sells for $342. Because of the difference in cost, Defendants state that Star's assumption "does not make economic sense and is not credible." Further, Defendants explain that Ademco's Senior Vice President of Marketing stated that the pre-low feature "has never been recognized by customers or promoted by Ademco as a key advantage."

Defendants argue that Star's assumption that three smoke detectors would be included in each security system sold lacks any support. They explain that Star never assessed the market to determine whether convoyed sales would even be appropriate. Defendants add that if Star's assumption that smoke detectors drive security system sales were correct, at least one smoke detector would be sold for every security system. Defendants note, however, that Ademco typically sells five times as many security systems as smoke detectors. They conclude that "the sale of security systems does not hinge on the predicate sale of smoke detectors."

Finally, Defendants argue that it is unacceptable to use Star as an expert if he is not being used to opine on whether Plaintiff is entitled to lost profits, but instead is simply responsible for certain basic mathematical calculations.

> Subtraction and multiplication are not scientific, technical, or other specialized knowledge. Fed. R. Evid. 702. Neither would this testimony be helpful to the jury. *Id.* To the contrary, any testimony by Star would only confuse the jury and risk severe prejudice to defendants that the jury mistakenly understand the credentialed expert proffer of $24,000,000 to be one based on reasoned analysis.

Moreover, Defendants explain that as long as the mathematics works out correctly, these figures could be admitted by means of judicial notice, or through stipulation of the parties.

In addition, Defendants state that the wording of Star's report indicates he is offering opinions on entitlement to damages. Therefore, Plaintiff should not be permitted to save the report by arguing it is one of mere calculations.

**PLAINTIFF**

Plaintiff responds that Star's expert report is admissible. It states that "Dr. Star's report and his opinions are neither directed to, nor concerned with, the threshold question of entitlement

to lost profits. In other words, the Defendants wish to strike Dr. Star's report because of an unsupported opinion that Dr. Star does not even give." According to Plaintiff, Star's opinion is only related to the calculation of damages. Plaintiff adds that,

> a careful review of the factual basis for Dr. Star's report demonstrates that even though Dr. Star's opinion is limited to the calculation of Interlogix's lost profits damages, Interlogix has a sufficient factual basis to support, as a threshold matter, its entitlement to lost profits damages. Interlogix will also introduce at trial additional testimony and evidence through other witnesses to further support its lost profits claims, including additional evidence that would relate to each of the four *Panduit* factors.

Plaintiff states that Star is not required to consider the threshold Panduit factors because he does not opine on the issue of entitlement.

Plaintiff argues that "[t]he rigorous standard to which Defendants subject Dr. Star's expert testimony is the standard courts employ to determine lost profits damages after parties have had the opportunity to present their evidence at a full hearing or trial, and is not appropriate for evaluating the admissibility of Dr. Star's report at this stage of the proceeding." While Defendants disagree with Star's conclusion, Plaintiff states that this is not an appropriate basis for exclusion under Daubert. Instead, Star's methodology is based on an admissible form of calculation.

Plaintiff also argues that Star's report is not factually deficient. The fluctuation in contribution margin of Plaintiff's parts does not affect the reliability of Star's report, according to Plaintiff, because its financial data clearly demonstrates such a fluctuation. "The factors causing the fluctuation are of no consequence, and hence irrelevant to the issues of lost profits damages calculation." In addition, Plaintiff states that Star does identify the Interlogix parts that would be sold in place of Defendants' allegedly infringing ones. It notes that three different parts are

clearly identified in Exhibit C of the report. Finally, Star explained in his report that he relied on summary data provided by patent counsel, and the deposition testimony of Honeywell's 30(b)(6) deponent, Precht. Thus, "Defendants' motion to strike Dr. Star's lost profits analysis as unreliable presents, at best, a classic dispute among experts that should be resolved by [the] fact finder at trial."

Alternatively, Plaintiff argues that Star's report contains sufficient legal and factual bases to satisfy the Panduit factors. It explains that the Panduit test is not an exclusive means for determining a patentee's entitlement to lost profits, and the four factors need not all be proven to establish entitlement. Plaintiff concedes that Star may not have supplied factual bases for some of the parts of the Panduit test. Plaintiff argues, however, that it is inappropriate to strike the report at this stage. Instead, Plaintiff states, the report should be dealt with by the trial judge after the rest of the evidence concerning entitlement to damages has come in.

When addressing Panduit, Plaintiff cites BIC Leisure Products, Inc. v. Windsurfing Int'l Corp., 1 F.3d 1214 (Fed. Cir. 1993) for the proposition that the Panduit test operates under "an inherent assumption that the patent owner and infringer sell products sufficiently similar to compete against each other in the same market segment."

**1. First Panduit Factor: Demand.**

Plaintiff states that Rothman's claim that customers did not desire or demand the pre-low battery feature is insufficient to warrant striking Star's report. Plaintiff states that Rothman's claim leaves open to speculation why Defendants added this feature to their smoke detectors if it was not desired. Further, Plaintiff again cites BIC, 1 F.3d at 1218-19 to argue that "courts recognize that demand for the infringer's and patent owner's product may be interchangeable,

and therefore a court may presume that evidence of sales of the infringing product establishes 'demand for the patent product.'" Consequently, Star satisfied the first Panduit factor by relying on Defendants' financial information and testimony concerning sales of its allegedly infringing product. Any challenge to Star's reliance on Defendants' data, according to Plaintiff, would be to the credibility, not admissibility of Dr. Star's report. Therefore, Defendants should attack Star through cross-examination and presentation of contrary evidence, rather than moving to have his report stricken.

### 2. Second Panduit Factor: Availability of Non-infringing Substitute Products.

Plaintiff states Defendants' argument that Ademco would have obtained non-infringing product from its sister company, System Sensor, or that System Sensor could have disabled the pre-low battery feature, "compares apples to oranges." Plaintiff explains that the pre-low battery feature is the patented component at issue in this litigation. It argues that "[a] smoke detector that does not have the pre-low battery feature would certainly not infringe Interlogix's patent, but it would not be the sort of 'non-infringing substitute' that would prevent Interlogix from satisfying *Panduit*'s second factor." Plaintiff cites Kaufman Co. v. Lantech, Inc., 926 F.2d 1136, 1142-43 (Fed. Cir. 1991) for the proposition that "product lacking the advantages of that patented is not an acceptable, non-infringing substitute."

### 3. Third Panduit Factor: Ability to Meet Demand.

Plaintiff states that while it may present additional evidence at trial to demonstrate its capability to exploit the market, the evidence of its actual sales is already sufficient to establish a factual basis for Star's report. Any disagreement with this conclusion, according to Plaintiff, bears on the weight and credibility of the opinion, but not on its admissibility.

### 4. Fourth Panduit Factor: Amount of Profit but for Infringement.

Plaintiff cites its initial argument concerning calculation of lost profits to argue that Star's report satisfies this fourth Panduit factor.

Plaintiff emphasizes that Star has not raised any questionable theory of causation. His report is not based on a hypothetical market, according to Plaintiff. Rather it is based on "Defendants' own data establishing the number of sales of infringing smoke detectors." Further, in response to cases such as Blue Dane Simmental Corp v. American Simmental Assoc., 178 F.3d 1035, 1040 (8th Cir, 1999) in which experts failed to consider all the independent variables affecting their conclusions, Plaintiff states that "Dr. Star's report, restricted as it is to the calculation of Interlogix's lost profits, does not suffer from this deficiency."

Plaintiff was asked at the motions hearing whether it intended for Star to testify to entitlement issues or only calculations. Plaintiff responded that Star would not testify that Plaintiff was entitled to damages for particular reasons. Instead, Star will testify to having made certain assumptions about the foundation for damages, and then discuss the computation of damages. When Plaintiff was then asked why it would be necessary to have Star testify to these basic computations, it responded that Star can add his expertise by saying that lost profits are an entirely appropriate category of damages.

### E. The Court's Order.

The Court grants Defendants' motion in part and denies it in part without prejudice. It is not clear from Plaintiff's memorandum and answers at oral argument whether Star is intended to testify concerning entitlement to damages, or only concerning computation of damages. As a result, the Court considered whether it would be appropriate for Star to testify on either of these

categories.

### 1. Entitlement to Damages.

The Panduit test is not the only way to show that infringement caused lost profits. But in order for any method to be acceptable, it must involve "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." Grain Processing Corp. v. American Maize-Products Co., 185 F.3d 1341, 1350 (Fed. Cir. 1999). Further, this "but for" analysis can not be speculative. The patent owner must show a reasonable probability that it would have made the infringer's sales. See BIC, 1 F.3d at 1218.

With respect to his category of direct actual damages, Star makes the following argument: During the time in question, Defendants sold approximately 600,000 allegedly infringing smoke detectors to buyers other than Plaintiff. Plaintiff had a legal patent monopoly on the pre-low battery warning feature that was part of those smoke detectors. Therefore, if Defendants had not infringed the patent, Plaintiff would have made an additional 600,000 sales.

Star's conclusion is not the shortcoming of his argument. Plaintiff might or might not have made the speculated 600,000 sales. Thus, his conclusion may actually be correct. But Daubert is concerned with method rather than conclusion, and, therefore, that is not the issue. Star's problem is that the two premises of his argument do not imply the conclusion. If Defendants had not made the allegedly infringing smoke detectors, it is possible they would have sold 600,000 of another type of smoke detector instead. As a result, Plaintiff would not have made any more sales without the infringement. Alternatively, customers might not have bought from Plaintiff even if it had been the only seller of smoke detectors with the pre-low battery warning feature. Many variables including, for example, brand recognition, availability, price,

and the relative importance of the battery feature might have influenced which kinds of smoke detectors would have been bought in the absence of the allegedly infringing ones, and from whom. Hence, the report does not address very basic questions concerning why Plaintiff would have made the 600,000 sales. Plaintiff offers possible explanations in defense of Star's report, but that is not sufficient. Federal Rule of Civil Procedure 26(a)(2)(B) requires that the report itself contain a complete basis for the opinion.

Plaintiff also argues from BIC, that there is "an inherent assumption that the patent owner and infringer sell products sufficiently similar to compete against each other in the same market segment." But the court in BIC explained that this assumption is appropriate when "the patent owner's and the infringer's products were similar in price and product characteristics." 1 F.3d at 1219. The court went on to reject the assumption of a unitary market for sailboards. Instead, the particular interests of the customers in that market demonstrated that the patent owner and infringer were effectively selling different types of products at different prices to different customers. See id. Because Star does not include any facts about relative price of products, or any other details of the smoke detector market in his report, the Court has no basis for assuming demand for Plaintiff's product, or the absence of acceptable noninfringing alternatives. Therefore, the report remains deficient despite BIC's holding.

The Court is not holding that to be admissible, Star's report must prove entitlement so strongly that there is no room to question. Opposing sides often produce expert reports that reach differing conclusions while both are still admissible. In the present case, however, Star's report is too speculative to meet the requirements set forth by the Federal Circuit for demonstrating lost profits. The report includes certain apparently important facts, but leaves out a large number of

others. This is an error in expert testimony that the Supreme Court has cautioned against, stating, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

This district court has also stated that "the goal of the trial court's gatekeeping function is to ensure 'that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work.'" Group Health Plan, Inc. v. Philip Morris, Inc., 188 F. Supp.2d 1122, 1131 (D. Minn. 2002) (quoting Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318 (7th Cir. 1996)). That court then concluded, under Daubert, that an expert's speculative testimony concerning causation and economic loss was too unreliable to be admitted. See id. at 1131-34. It is equally appropriate under Daubert's gatekeeping function in the present case to exclude Star's report, with respect to entitlement to damages.

The unduly speculative nature of Star's report is only magnified in the section concerning indirect actual damages. This section is premised on the previous section's conclusion that but for the allegedly infringing product, Plaintiff would have sold an additional 600,000 smoke detectors. Star then observes that Plaintiff's security systems are only compatible with its own smoke detectors. He assumes that an average of three smoke detectors are included in each security system. And he concludes that the additional smoke detector sales would produce an additional 200,000 security system sales for Plaintiff.

As stated above, the additional 600,000 sales figure lacks sufficient support. Star also does not explain why he assumes three smoke detectors should be included in each security system. Nor does he provide a basis for assuming security system sales would follow smoke detector sales. As a result, the report is insufficiently reliable to meet the Daubert standard. See

e.g. Target Mkt. Publ'g, Inc. v. Advo, Inc., 136 F.3d 1139, 1142-44 (7th Cir.1998) (affirming exclusion of expert report on lost profits from joint business venture based on the report's unsupported assumptions regarding, inter alia, the product's penetration into new markets). Therefore, the report is inadmissible for purposes of demonstrating entitlement to lost profits.

**2. Computation of Damages.**

"A decision to allow expert testimony is within the broad discretion of the trial judge and is to be sustained on appeal unless manifestly erroneous." Deimer v. Cincinnati Sub-Zero Prods., Inc., 58 F.3d 341, 345 (7th Cir.1995) (citations omitted).

> In evaluating a Rule 104(a) proffer of expert testimony, the ultimate test is whether the testimony would assist the trier of fact in understanding the evidence. See, *e.g.*, *United States v. Solis*, 923 F.2d 548 (7th Cir.1991). If the expert testimony would be helpful and relevant with respect to an issue in the case, the trial court is not compelled to exclude the expert just because the testimony may, to a greater or lesser degree, cover matters that are within the average juror's comprehension. See Weinstein's Evidence, ¶. 702[02] at 702-20 to 702-21 (1996); Michael H. Graham, Federal Practice and Procedure--Evidence, § 6644 at 265-66 (Interim edition 1992).

United States v. Hall, 93 F.3d 1337, 1341 (7th Cir.1996).

"An expert's credentials and methodology may be impeccable, but if the proffered testimony fails the general test of relevance under Rule 402, or if, in the words of Rule 702 it is not likely to "assist the trier of fact to understand the evidence or to determine a fact in issue," then the district court should reject the proffer." Id. at 1342.

In Zic v. Italian Gov't Travel Office, the court found that some of an expert's report included basic grade school mathematics, but nevertheless admitted the testimony, stating "as an accountant, Mr. Herzog has specialized knowledge that would be helpful to a jury in calculating

the appropriate amount of damages." 130 F. Supp.2d 991, 999-1000 (N.D.Ill.2001).

Clearly, the mathematics that Star would perform does not require expert testimony. His damages calculations involve fairly simple multiplication. As a result, they are likely within the average juror's comprehension. In Zic, the court admitted expert testimony in this situation, nevertheless, because it found the expert's specialized knowledge could still help the jury. But in Zic, the court had found the expert's entire report sufficiently reliable to be admitted under Daubert. Therefore, there was no concern that the expert's credentials would prejudice the jury into accepting otherwise unreliable testimony. As a result, Zic's holding does not suggest that the Court should allow Star to testify to his computations in the present case.

At this point in the present case it is impossible to determine whether Star's testimony could actually assist the jury, or whether instead it could only have a prejudicial effect. That determination can only be made after reviewing all of the other damages evidence that will be presented to the jury. Therefore, this issue should be presented to the district court judge prior to trial. Consequently, the Court denies Defendant's motion without prejudice with respect to Star testifying merely to the computation of damages. Defendants are free to revisit this subject with Judge Doty at the point at which he considers motions concerning the admissibility of evidence on this matter.

**THEREFORE, IT IS HEREBY ORDERED that:**

Defendant's Motion to Strike the Expert Report of Dr. Alvin Star (Doc. No. 21) is **GRANTED IN PART** with respect to entitlement to lost profits damages and **DENIED IN PART WITHOUT PREJUDICE** with respect to computation of damages.

Dated: January 9, 2003

Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500

## NOTICE

The latest amendments to the federal rules of procedure, (Civil, Criminal, Appellate and Bankruptcy), went into effect on December 1, 2002. The new amendments and related committee notes can be found at www.uscourts.gov/rules/amendments0202.htm.

One change is particularly noteworthy. That is Rule 7.1 of the Federal Rules of Civil Procedure. This rule requires that corporations file a "disclosure statement" whenever they initially appear as a party in a federal court action. The Rule 7.1 Disclosure Statement must identify "any parent corporation and any publicly held corporation that owns 10% or more" of the stock of the corporate party filing the statement. The purpose of the disclosure statement is to help judges and magistrate judges identify potential conflicts of interest. (Similar disclosure statement requirements are prescribed by Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 12.4 of the Federal Rules of Criminal Procedure.)

Beginning December 1, 2002, a Rule 7.1 Disclosure Statement must be filed by every corporation when it first appears in a federal action, even if the corporation merely reports that there is no parent corporation or publicly held corporation that owns 10% or more of its stock. These Disclosure Statements must also be filed retroactively, for every corporation which is a party to an action pending in this District as of December 1, 2002. The retroactive Rule 7.1 statements must be filed immediately.

It also should be noted that there have been extensive stylistic changes, (as well as a few substantive changes), to the Federal Rules of Criminal Procedure. Attorneys who appear in federal criminal cases should review the amended version of the Rules.